1 Mass. App. Ct. 787 (1974)
307 N.E.2d 576
CLEMENT T. DeSAUTELS, administrator, petitioner.
Appeals Court of Massachusetts, Worcester.
January 8, 1973.
February 28, 1974.
Present: HALE, C.J., KEVILLE, & GRANT, JJ.
Russell F. Bath, Jr. (C.A. Peairs with him) for Adele Toliusyte-Sarkiene & others.
Robert J. Arakelian (Richard J. Sarapas with him) for Anicetas Simutis, Consul General of Lithuania.
KEVILLE, J.
The underlying petitions presented for allowance in this case in a Probate Court are a petition for the allowance of the administrator's first account and the administrator's petition for distribution in the estate of Frank Gudavich, who died on February 13, 1968, a resident of Millbury, Massachusetts. Before us is an appeal by the Consul General of the Republic of Lithuania (Consul *788 General) from the denial of his motion to strike the appearance of Russell F. Bath, Jr. (Bath), and from the allowance of the latter's motion to strike the appearance of the Counsul General, their appearances having been filed in respect to both the underlying petitions. Bath purports to represent heirs of the decedent who are residents of Lithuania. There is a transcript of the evidence, and the probate judge made a report of material facts.
The administrator's petition for distribution lists fifteen next of kin of the decedent. Among them are thirteen residents of Lithuania. The question is who may properly represent the Lithuanian heirs in the settlement of this estate.
Bath filed an appearance in the Probate Court claiming to represent eleven of these persons, listing them by name. The Consul General filed an appearance as "attorney ex officio for the heirs who are resident national Lithuanians."[1] In support of his appearance Bath introduced in evidence ten documents purporting to be powers of attorney given to the New York law firm of Wolf, Popper, Ross, Wolf and Jones (Wolf) by the eleven Lithuanians for whom he had filed an appearance, and for one other (Prane Iono Klimene) whose name it is assumed was inadvertently omitted from the appearance slip. No appearance or power of attorney was filed for the thirteenth Lithuanian heir, Petre Paulauskiene.[2]
The powers of attorney, save for the names and addresses of the signatories, are identical in form and in content. They are in the Russian language with an English translation. The signature authentication appears as a four-step process through Soviet officialdom in Lithuania and in *789 Russia culminating in an acknowledgment by a United States Consul in Moscow that the last of the authenticators is Assistant Chief of the Consular Administration of the Ministry of Foreign Affairs of the U.S.S.R., followed by a caveat that "[t]his authentication is not to be interpreted as implying recognition of Soviet sovereignty over Lithuania."
Bath was the sole witness at the hearing in the Probate Court. His testimony revealed that he had no knowledge whether his Lithuanian clients had any understanding of the Russian language.[3] He did not know how the powers of attorney came to the hands of Wolf in New York city or the places at which or the circumstances under which they were signed. He had had no correspondence with these clients nor did he have knowledge whether Wolf or anyone else had corresponded with them. He could not explain how all of these persons came to sign identical powers appointing Wolf.
The estate is comprised entirely of personal property consisting of a few stocks, bankbooks and cash. The first account shows a balance of approximately $78,000 for distribution after the deduction of $14,650 in expenses including an administrator's fee and a fee for legal services of about $5,800. Of the sum to be distributed, almost two thirds is designated for the Lithuanian heirs. From this sum Bath, Wolf and "Iniurkolegia" (described by Bath as a Russian bar association in Moscow set up under Soviet law[4]) expect to receive a little less than one third. The fees *790 are based upon a percentage of the sum distributed to the heirs without regard to the services performed. If the money is received by Bath, it will be forwarded to Wolf and thence through a bank directly to Russia. The evidence did not reveal the method by which their shares would reach the Lithuanian heirs. There was no evidence that the heirs had knowledge that a little less than one third of their distributive shares would be taken in fees by their attorneys. Bath's function in this case was to collect the money and pass it along to Wolf.
Our examination of the judge's report of material facts in the light of the transcript makes it plain that his rulings on these motions were based only minimally upon the evidence before him, and largely upon extraneous sources of information, including testimony he had heard in unrelated cases.[5] He could not act upon his prior knowledge of particular facts which are not a matter of common knowledge or observation. Ferriter v. Borthwick, 346 Mass. 391, 393 (1963), and cases cited. We conclude that his findings are not supported by the evidence and are plainly wrong. We further conclude that the proper resolution of the issues involved will require a trial de novo.[6] Upon rehearing, *791 issues sought to be raised by the Consul General at the hearing in the Probate Court on these motions should be dealt with before distribution is decreed. In anticipation thereof we think it appropriate to discuss some of them now.
It is a basic responsibility of the probate judge and of the administrator to make every reasonable effort to assure that a decedent's estate is properly distributed among his heirs. "Fiduciaries and the courts, which have authority over them and to which they are accountable, are under an obligation to carry out the direction of the testator or settlor, or the legal direction in the case of intestacy. Implicit in that obligation is the duty to deliver monies belonging to such persons in foreign countries, and at the same time to be reasonably sure that the amount, less costs of transmission and exchange into foreign currency, can be transmitted to them through regular international banking channels, consular offices or some other legal and effective means." In re Estate of Kish, 52 N.J. 454, 467 (1968).
The discharge of those responsibilities is magnified by the abnormal circumstances of this case. We take judicial notice of the conquest in 1940 of the territory and people of the Republic of Lithuania by Soviet Russia and of the continued subjugation of that territory and its people down to the present time. We also judicially notice that the United States does not recognize the forced incorporation of Lithuania into the Soviet Union and continues to recognize the government of the Republic of Lithuania represented by the Consul General. See Universal Adjustment Corp. v. Midland Bank, Ltd. of London, 281 Mass. 303, 323 (1933).
Against this international backdrop, the problems of identification and representation of heirs and the proper distribution of the estate are obviously compounded. Viewed in the light of the facts presented on this record, we think that the court should consider them collectively as facets of the same problem. In its enactment of G.L.c. 206, §§ 27A (inserted by St. 1950, c. 265) and 27B (inserted by *792 St. 1956, c. 257,[7] the Legislature recognized these as special problems and gave the court additional authority to deal with them. These statutes provide for action by the court in various situations in which the court in its discretion finds either that the identity of a claimant is in doubt or that there is no reasonable assurance that a distributee will actually receive full payment of his share in substantially full value.[8]
The burden rests upon those asserting that they are entitled to share in an estate to prove their contention. Hopkins v. Hopkins, 287 Mass. 542, 544 (1934). In Danilovitch, petr. 322 Mass. 283 (1948), claims made under c. 206, § 27, to receive the distributive shares of citizens of Poland were rejected where they were based solely on the strength of a power of attorney purportedly executed by the heirs in Poland and authenticated by Russian authorities. In confirming the probate judge's decision, the Supreme *793 Judicial Court said (id. at 285-286) that "the recitals in the power of attorney and in the petitions before us are but self-serving statements which, without more, do not entitle the petitioners to the relief presently sought.... In these circumstances we are of opinion that the evidence before the judge was not sufficient to satisfy the burden of proof resting on the petitioners of establishing that they were entitled to payment of the deposits.... The petitioners, of course, upon sufficient proof of their identity as the persons for whose benefit the deposits were made, would become entitled to the relief they now seek, but not otherwise."
In a subsequent case involving an order of the Probate Court under § 27A, concerning the claims of Polish heirs, the court said, "The foreign heir or distributee acquires his rights by the law of this Commonwealth and is bound by the provisions of that law as to the time and manner of distribution." Mazurowski, petr. 331 Mass. 33, 37-38 (1954). The court described § 27A as a "reasonable and valid regulation of the final distribution of estates of deceased residents of this Commonwealth designed to preserve the property interests of the distributees" (emphasis supplied). Id. at 39.[9] Acceptance by the court of the powers offered by Bath should take place only if the court is satisfied of their authenticity, after a full hearing and the introduction of supporting evidence.
We turn to the question of fees. If the rulings of the trial judge were to stand without further testimony, no obstacle would remain in the case at bar to the transfer of the funds belonging to the Lithuanian heirs and to the subtraction *794 therefrom of "a little less than a third" as a fee to their attorneys unless of course the judge were to act on his initiative. See Mazurowski, petr., supra, at 38. The exaction of such a fee for the largely ministerial function of transmitting distributive shares to the heirs would be unconscionable judged by the well-established criteria in this Commonwealth for determining what constitutes a fair and reasonable charge to be made by an attorney for his services. The criteria need not be repeated here. See Cummings v. National Shawmut Bank, 284 Mass. 563, 569 (1933). On this record none of them appears to have been met.
It would hardly be in the interests of justice were the court to find, upon rehearing, that their inheritances could be transmitted (see fn. 8) to the Lithuanian heirs in "substantially full value," while tolerating an unwarranted diminution in their inheritances through excessive fees to those who would represent them.
Neither the powers of attorney nor the testimony of Bath reveals that the heirs have agreed to pay a contingent fee of such proportions. Assuming that such an agreement exists, it would hardly meet our standards of reasonableness. See S.J.C. Rule 3:14 (351 Mass. 795); McInerney v. Massasoit Greyhound Assn. Inc. 359 Mass. 339 (1971). In the McInerney case, an arrangement for fees which provided that counsel would retain one third of any settlement he obtained for his client over and above alimony and support payments was held to be unenforceable. Id. at 352. The court said, "We are therefore not inclined to place our imprimatur on an agreement dictated by a member of the bar which provided for so much to him in return for so little." In these circumstances the court has a special responsibility in passing upon the reasonableness of these expected fees.
In In re Estate of Kish, 52 N.J. 454, 472 (1968), the court said: "In view of a court's inherent power to pass upon the reasonableness of fees charged in connection with any matter before it, any fee arrangement set forth in such a *795 power of attorney is subject to judicial review. A court should make inquiry in these situations as to the existence of any such percentage arrangement, since the client is in a foreign country, is bound to be unfamiliar with appropriate fees and charges here, and cannot personally be heard."
No evidence has been introduced in behalf of the Consul General to demonstrate his capacity to represent the Lithuanian heirs effectively. His right to be their representative is contingent in any event upon the absence of other authentic representation. See Matter of D'Adamo, 212 N.Y. 214, 229 (1914); Matter of Zalewski, 292 N.Y. 332, 338 (1944). Upon rehearing he will have the difficult burden of satisfying the court, since he represents a government which has been in exile for over thirty years, that he can effectively place these funds in the hands of the heirs in Lithuania. However, until the Probate Court determines that another may properly represent them, or in the absence of such a determination, that the administrator, under the court's direction, may transmit the funds directly to the heirs, or until the court orders other disposition of them under our statutes  it would not be appropriate to strike his appearance in their behalf.
The denial of the motion of the Consul General to strike the appearance of Bath and the allowance of Bath's motion to strike the appearance of the Consul General are set aside. The case is remanded to the Probate Court for retrial and for further proceedings not inconsistent with this opinion. Costs of appeal are not to be awarded to any party.
So ordered.
NOTES
[1] Rule 2 of the Probate Court Rules (1959) provides in part that "[w]hoever appears for himself or for another in the Probate Court, after the entry of a petition, shall enter his appearance in writing giving his name, place of residence or business, the matter in which and the name or names of the person or persons for whom he appears" (emphasis supplied).
[2] The court in its discretion could have appointed a guardian ad litem to represent the interests of this heir. See Doggett v. New England Trust Co. 327 Mass. 167, 171 (1951).
[3] The power given by one of these, Prane Iono Klimene, states that she is illiterate; and there is no indication on the power that she was informed of the nature of the document upon which she put her mark.
[4] See In re Mitzkel's Estate, 36 Misc.2d (N.Y.) 671, 675 (1962): "It further appears from the record, buttressed by facts of which the court may take judicial notice (Civ. Prac. Act, § 344-a), that `Iniurcolleguia' is a body of Soviet lawyers in Moscow organized and constituted pursuant to statute under the jurisdiction and control of the U.S.S.R. Ministry of Justice, for the purpose of exclusive representation of Soviet nationals in foreign legal matters. It is in effect a bureau of said ministry and an agency of the Soviet Government. It carries on its business as a collective or co-operative of lawyers assigning members to handle cases for its clients, forwarding matters to attorneys of its own selection and when necessary securing their appointment as attorneys in fact for their clients, as was done here. Lawyers' collectives exist in various cities of the Soviet Union for the practice of law in the domestic field on the same basis. Although not prohibited, there is little, if any, of private practice of law. But in the foreign field, it is prohibited for a Soviet national to act except through `Iniurcolleguia.'"
[5] He found, e.g., "The Worcester Probate Court has seen, read and studied numerous similar powers filed in a large number of cases in the Court. The New York law firm has acted under similar powers in a large number of cases in this Court and in Courts throughout our Country...

"I am forced to find that the Attorney-in-Fact under the powers of attorney has done an admirable job in finding the next-of-kin. The Consul has done nothing in this respect. On the other hand I must find that the vast amount of work done by the Attorney-in-Fact and their Worcester representative, Mr. Bath in finding the kin and protecting their rights must be given serious consideration."
[6] The validity of each of the powers of attorney which were introduced in evidence is limited by its terms to three years from the date of execution. This period had, in each case, expired prior to the hearing on the appeals in this court, but not until after the rulings of the probate judge. However, Bath has represented to this court that he now possesses new powers of attorney executed in 1973 by the same persons for whom he initially appeared in the Probate Court. The validity of the new powers will present a threshold question upon rehearing before another judge, the judge who heard these motions having retired.
[7] Section 27A. Whenever payment of a legacy or distributive share cannot be made to the person entitled thereto, or such person may not receive or have the opportunity to obtain said legacy or distributive share, the court, on petition of an interested party or in its discretion, may order that the money be deposited in a savings bank or other like institution, or invested in the manner provided in section twenty-five, and disposed of in the manner provided in section twenty-eight. When a claimant to such funds resides outside of the United States or its territories, the court in its discretion, in order to assist in establishing such claimant's identity, right and opportunity to receive such fund, may require the appearance in person before the court of such claimant.

Section 27B. Whenever payment of a legacy or distributive share is to be made to a person who is domiciled in a country or state outside of the United States or its territories in which the court, in its discretion, finds that there is not a reasonable assurance that such legatee or distributee will actually receive payment of his legacy or distributive share in substantially full value, the court, upon petition of the executor, administrator, or an interested party, or in its discretion, may order that such legacy or distributive share be paid, in whole or in part, to said executor, administrator, or interested party for use by him in the purchase of goods in the form of necessaries of life, food, clothing and medicines, to be sent to such legatee or distributee through a recognized public or private agency, upon his written request, order, or assignment.
[8] We note that by Amendment 4 to Treasury Dept. Circular 655, 33 F.R. 9708, July 4, 1968, Estonia, Latvia, Lithuania and the U.S.S.R. were deleted from the United States Treasury regulation restricting distribution of funds from United States Government sources (31 C.F.R. § 211.2)  a factor to be considered by the court in passing upon the procedure to be followed in the distribution of private funds to Lithuanian heirs. There is no indication in the record that this regulation, to which our attention was directed in oral argument, was brought, as it should have been, to the attention of the probate judge.
[9] In his brief Bath suggests that the constitutionality of G.L.c. 206, § 27A, "may be clouded" by Zschernig v. Miller, 389 U.S. 429 (1968). In that case the court held to be unconstitutional an Oregon statute prohibiting the transfer of inherited funds to non-resident alien heirs unless the heirs could show that reciprocity in inheritance existed in the foreign country and that they would receive full use, benefit and control of the funds. The court found the statute to be an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress. The Massachusetts statute is, in our view, distinguishable from the Oregon statute under consideration in that case. Not only does § 27A have no requirement of reciprocity but it is to be noted that the ruling of unconstitutionality in the Zschernig cases was expressly limited to the manner in which the State court applied the statute in that case.